IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

RAFAEL GOMEZ URANGA, DAVID
LAZARO OLIVA, and ORLANDO
VIDAL,

Defendants.

CRIMINAL CASE NO.
1:13-CR-463-LMM-LTW

## MAGISTRATE JUDGE'S ORDER AND REPORT AND RECOMMENDATION AND ORDER CERTIFYING DEFENDANT VIDAL FOR TRIAL

Pending before this Court is Defendants Orlando Vidal, Rafael Gomez Uranga, and David Lazaro Oliva's Motions to Dismiss the Indictment for Violation of the Right to Speedy Trial. (Docs. 37, 45, 61). Also before the Court is Defendant Oliva's Motion to Adopt Co-Defendants' Motions to Dismiss and Related Pleadings to Dismiss the Indictment for Violation of the Right to Speedy Trial. (Doc. 58). Defendant Oliva's Motion to Adopt is **GRANTED**. (Doc. 58). Having considered the parties' briefs and all supporting documents submitted, and for the reasons set forth below, this Court **RECOMMENDS** that Defendants' Motions to Dismiss the Indictment for Violation of the Right to Speedy Trial be **DENIED**. (Docs. 37, 45, 61). Because there are no more motions or other matters to address for Defendant Vidal, the undersigned certifies

AO 72A
(Rev.8/82)

Defendants Vidal ready for trial.[1]

## DEFENDANTS' MOTIONS TO DISMISS FOR VIOLATION OF THE RIGHT TO SPEEDY TRIAL

Defendants argue the Indictment against them should be dismissed because the nearly two-year delay between the Indictment, entered in late November 2013, and their October 2015 arrest compromised their right to a speedy trial in violation of the Sixth Amendment of the United States Constitution. In support, Defendants argue the lengthy delay was inexcusable because it was caused by the Government's lack of diligence. The Government responds that because the reason for the delay stemmed only from a task force officer's mistaken belief that the United States Marshal's Service would locate and arrest the Defendants without prompting from him, and because the Defendants cannot prove that they suffered from any prejudice from the delay, the Defendants' speedy trial rights have not been violated.

## I.  BACKGROUND

On or around November 21, 2011, the Federal Bureau of Investigation ("FBI") opened an investigation into the burglaries of two Norcross, Georgia warehouses, one maintained by SouthernLINC Wireless and the other by Max Group, containing cellular

---

[1] Defendant Gomez Uranga has an outstanding Motion to Suppress Statements. (Doc. 41). If the District Court adopts this Court's Report and Recommendation, this Court will immediately set an evidentiary hearing in connection with the Motion to Suppress Statements. Defendant Gomez Uranga's Daubert Motion to Exclude Shoe Print Identification has been **DEFERRED** to the District Court. (Docs. 40, 44). Defendant Oliva filed a Motion to Reopen Bond Hearing on August 2, 2016, which this Court will hear on September 12, 2016. (Doc. 90).

2

devices. (Aff. of Michael Donnelly, hereinafter "Donnelly Aff.," ¶ 2; Doc. 1, at 2). On March 27, 2012, FBI Task Force Officer Michael Donnelly ("TFO Donnelly") took over the investigation after the former FBI case agent was deployed overseas. (Donnelly Aff. ¶¶ 1, 3). TFO Donnelly was assigned to the FBI Atlanta's Safe Streets Gang Task Force in 2010 and has served with the Gwinnett County Police Department since 2003. (Donnelly Aff. ¶¶ 1, 3). TFO Donnelly became the sole investigator assigned to the case. (Donnelly Aff. ¶ 3).

On November 25, 2013, the Grand Jury charged a two count Indictment against Defendants Rafael Gomez Uranga, David Lazaro Oliva, and Orlando Vidal (collectively referred to as "Defendants"). The Indictment charged that Defendants conspired and aided and abetted each other with transporting in interstate commerce more than $5,000 in electronic equipment and pallets of cellular telephones which were stolen, converted, or taken by fraud from the SouthernLINC Wireless and Max Group warehouses in violation of 18 U.S.C. §§ 2, 2314. (Doc. 1). On the same day, the Indictment was placed under seal and arrest warrants for each Defendant were issued. (Donnelly Aff. ¶ 4; Doc. 3).

A.   **TFO Donnelly Mistakenly Relies on the Marshal's Service to Arrest the Defendants**

According to TFO Donnelly, in a typical Gwinnett County investigation where the locations of the defendants are not known, the Gwinnett County Sheriff's Department, not the investigating officer, is "the primary agency tasked with locating

3

and arresting the defendants." (Donnelly Aff. ¶ 6). In Gwinnett County, the Gwinnett County Sheriff's Department also enters warrants for arrest into the National Crime Information Center ("NCIC") database, which is used by law enforcement to query whether an individual has an outstanding arrest warrant. (Donnelly Aff. ¶ 7). TFO Donnelly testified that in Gwinnett County, once an indictment is entered and he obtains an arrest warrant from the magistrate judge, his involvement ends. (May 11, 2016 Tr. of Evid. Hrg., hereinafter "Tr2," 35). The investigating officer also does not enter information for the arrest into the NCIC database. (Donnelly Aff. ¶ 7).

TFO Donnelly states that until mid to late September 2015, he believed that the United States Marshal's Service operated the same way in the federal system as the Gwinnett County Sheriff's Office did in the state system. (Donnelly Aff. ¶ 8). As a result, TFO Donnelly believed that the United States Marshal's Service ("the Marshal's Service") would enter the Defendants' information into the NCIC database and would locate and arrest Defendants. (Donnelly Aff. ¶ 8). Thus, TFO Donnelly presumed incorrectly that the U.S. Attorney's office or someone else would provide information to the Marshal's Service so that they would know where to locate the Defendants. (Tr2 42). TFO Donnelly did not confirm with anyone as to the precise process used in the federal system. (Tr2 39). TFO Donnelly never asked anyone who entered the information into NCIC. (Tr2 43).

TFO Donnelly states that several months after the Indictment was returned, he realized that Defendants had not been arrested. (Donnelly Aff. ¶ 9). TFO Donnelly

4

states that he then conferred with Task Force Officer Josh Thompson ("TFO Thompson"). (Donnelly Aff. ¶ 9; Tr. of Mar. 23, 2016 Evid. Hrg., hereinafter "Tr.," 32). TFO Thompson had served as a Task Force Officer with the Marshal's Service for ten years until he was reassigned to the FBI Safe Streets Gang Task Force in September 2013. (Donnelly Aff. ¶ 9; Tr. 32). TFO Donnelly states that since TFO Thompson had formerly served as a TFO with the Marshal's Service, he gave TFO Thompson copies of the arrest warrants and possible locations of the Defendants and asked him to communicate with the Marshal's Service to encourage them to locate the Defendants. (Donnelly Aff. ¶ 9). TFO Donnelly testified that he told TFO Thompson, "Can you see what the Marshals can do about finding these guys, because I haven't heard anything yet." (Tr. 25). TFO Donnelly further testified that he asked TFO Thompson to follow up with the Marshal's Service to see "if anybody was even looking at it." (Tr2 40).

TFO Thompson testified that he took the paperwork TFO Donnelly gave him back to his desk and called someone from the Marshal's Service. (Tr. 33). TFO Thompson testified that his contacts with the Marshal's Service informed him that when warrants or indictments are issued, a copy goes to the Marshal's Service, but the warrants are not worked by the Marshal's Service. (Tr. 33). Instead, the arrest warrant is worked by the investigating agency. (Tr. 34). TFO Thompson states that he found out that for a Marshal to be assigned to an arrest, it has to be requested by a federal agency or the Marshal. (Tr. 33-34, 39-40). TFO Thompson admits that obtaining this information did not require much effort on his part. (Tr. 43).

5

TFO Thompson states that he returned the paperwork to TFO Donnelly within three weeks or a month after he received it. (Tr. 34, 40). TFO Thompson recalls writing some information on the back of one of the criminal histories about information he had gotten. (Tr. 34). Although TFO Thompson believes that he may have written down information received from one of his Marshal's Service contacts in Florida, he does not remember what the information was. (Tr. 34-35). TFO Thompson remembers that he found the paperwork in his desk with notes on it, reviewed the paperwork, discussed with TFO Donnelly the information he had written on the paperwork but now cannot remember, and returned the paperwork to TFO Donnelly. (Tr. 36, 40; Tr2 11). TFO Thompson testified that he cannot remember what he and TFO Donnelly discussed during the conversation. (Tr2 11). TFO Thompson testified, however, that he knows he did not tell TFO Donnelly that the FBI handles its own arrests. (Tr. 40-42).

TFO Donnelly states that TFO Thompson eventually returned the materials back to him, but never discussed it with him. (Donnelly Aff. ¶ 9). TFO Donnelly subsequently testified that he may have spoken with TFO Thompson briefly when TFO Thompson returned the documents, but he does not recall what was discussed. (Tr2 40-41). TFO Donnelly states that after TFO Thompson returned the materials back to him, he was still under the impression that the Marshal's Service was responsible for arresting the Defendants. (Tr2 40). TFO Donnelly never followed up with the Marshal's Service about the matter. (Tr. 26). Likewise, TFO Donnelly never inquired about the matter with his supervisors at the FBI. (Tr. 26). TFO Donnelly does not recall

6

placing any calls to the AUSA between the time of indictment and October 2015. (Tr2 33). The AUSA assigned to the case never contacted TFO Donnelly regarding the status of the arrest. (Tr. 26).

### B.  TFO Donnelly Discovers His Error and Initiates the Defendants' Arrest

TFO Donnelly states in his Affidavit that around mid to late September 2015, he discussed his open cases with his supervisors. (Donnelly Aff. ¶ 10; Tr. 12). TFO Donnelly later testified that he discussed the matter with his supervisor on October 6, 2015. (Tr. 12). TFO Donnelly also testified that this was the only meeting of this nature he had with any of his supervisors since the Defendants were indicted. (Tr. 30). At that time, TFO Donnelly's supervisor informed him that the Marshal's Service does not enter arrest warrants for cases investigated by the FBI and that instead, the investigating agent is responsible for calling the NCIC office at the FBI to enter the arrest warrant into the NCIC database. (Donnelly Aff. ¶ 10; Tr. 29-30). TFO Donnelly states that he also learned that a lead should have been sent to the FBI's Miami, Florida office to locate and arrest Defendants. (Donnelly Aff. ¶ 10). On or around late September or early October 2015, TFO Donnelly contacted the NCIC office at the FBI and had the arrest warrants entered into the NCIC database. (Donnelly Aff. ¶ 11; Tr. 12). In late September or early October, TFO Donnelly accessed the CLEAR database, a database that contains public records for individuals, to find current potential addresses for Defendants and forwarded information about the Defendants' potential addresses to the FBI's Miami, Florida

7

office.  (Donnelly Aff. ¶ 12; Tr. 12-13).

On October 9, 2015, Defendants Vidal and Gomez Uranga were arrested in the Southern District of Florida.  (Donnelly Aff. ¶ 17).  On October 13, 2015, Defendant Oliva was arrested in the Southern District of New York.  (Donnelly Aff. ¶ 18).  In order to locate Defendant Oliva, TFO sent out a lead to the FBI in Miami with an address in Miami.  After the FBI in Miami contacted Defendant Oliva's father, Defendant Oliva turned himself in.  (Tr2 23).

Defendant Gomez Uranga had previously been arrested at the scene by Gwinnett County police in November 2011, for the burglary of the Max Group, but was later released.  (Tr. 21; Ex. A, Doc. 48-1, at 2; Doc. 81-1, at 4).  On February 11, 2014, an Assistant District Attorney in the state court criminal action against obtained an order entering nolle prosequi in the case.  (Doc. 81-1, at 4).  The Assistant District Attorney explained in her motion that "the U.S. Attorney's Office is going to prosecute [Defendant Gomez Uranga] for his role in a criminal enterprise whose activities included these crimes."  (Id.).

## II.   **LEGAL ANALYSIS**

Defendants argue the Indictment should be dismissed because the nearly two- year delay between the Indictment, entered in late November 2013, and their October 2015 arrest compromised their right to a speedy trial in violation of the Sixth Amendment of the United States Constitution.  In support, Defendants contend that the delay was the product of TFO Donnelly's and the U.S. Attorney's Office's lack of diligence.  The

8

Government responds that Defendants' right to a speedy trial has not been violated because the reason for the delay was only TFO Donnelly's mistaken belief that the Marshal's Service would locate and arrest the Defendants and Defendants cannot meet their burden of proving that they were prejudiced by the delay.

The Sixth Amendment of the United States Constitution guarantees an accused the right to a speedy trial. U.S. Const. amend. VI; United States v. Villarreal, 613 F.3d 1344, 1349 (11th Cir. 2010). A court is required to dismiss the indictment if it finds a violation of the defendant's right to a speedy trial. Villarreal, 613 F.3d at 1349. When determining whether a defendant's speedy trial right is violated, a balancing test is applied. Villarreal, 613 F.3d at 1350 (citing Barker v. Wingo, 407 U.S. 514, 522 (1972)). In Barker v. Wingo, 407 U.S. 514 (1972), the Supreme Court has explained that the following four factors are considered when determining whether the defendant's constitutional right to a speedy trial has been violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the speedy trial right; and (4) the prejudice to the defendant. Id. at 530; United States v. Ingram, 446 F.3d 1332, 1336 (11th Cir. 2006). Before the speedy trial analysis is begun, however, the defendant must allege "that the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay." Doggett v. United States, 505 U.S. 647, 651-52 (1992); Villarreal, 613 F.3d at 1350; Ingram, 446 F.3d at 1336. If the defendant is able to satisfy the threshold inquiry, only then are the remaining factors considered. Villarreal, 613 F.3d at 1350; Ingram, 446 F.3d at 1336. Delays exceeding one year are

9

generally found to be presumptively prejudicial. Ingram, 446 F.3d at 1336; United States v. Clark, 83 F.3d 1350, 1352 (11th Cir. 1996). The presumption that pretrial delay has prejudiced the accused intensifies over time. Ingram, 446 F.3d at 1338. The rationale for presuming prejudice is that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or identify." Ingram, 446 F.3d at 1339. Here, the Government concedes that the twenty-two month delay between Indictment and the Defendants' arrest satisfies the threshold inquiry. (Gov't's Br., Doc. 89, at 9); see also Ingram, 446 F.3d at 1337.

A.   **Reason for Delay**

Once the threshold inquiry is satisfied, the court may proceed with the remaining factors. The next factor to be weighed is the reason for the delay. Villarreal, 613 F.3d at 1351. "Government actions that are tangential, frivolous, dilatory, or taken in bad faith weigh heavily in favor of a finding that a speedy trial violation occurred." United States v. Bibb, 194 F. App'x 619, 622 (11th Cir. 2006); see also Villarreal, 613 F.3d at 1351 (explaining that a deliberate attempt to delay the trial in order to hamper the defense is weighed heavily against the Government). In contrast, reasons for delay, such as overcrowded courts, or contested interlocutory appeals, will not be weighed heavily against the Government. Villarreal, 613 F.3d at 1351; Bibb, 194 F. App'x at 622 (citing United States v. Schlei, 122 F.3d 944, 987 (11th Cir. 1997)). Negligence is often considered a middle ground. Doggett, 505 U.S. at 656. Although negligence obviously weighs less than a deliberate attempt to harm the accused's defense, it still "falls on the

10

wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun." Doggett, 505 U.S. at 657. "While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him." Doggett, 505 U.S. at 657. As the Supreme Court explained, "[c]ondoning prolonged and unjustifiable delays in prosecution would both penalize many defendants for the state's fault and simply encourage the Government to gamble with the interests of criminal suspects assigned a low prosecutorial priority." Doggett, 505 U.S. at 657. Thus, the more protracted the negligence, the more the presumption of evidentiary prejudice grows. Doggett, 505 U.S. at 657.

Here, the Government's actions in failing to procure the Defendants' arrest were grossly negligent. TFO Donnelly testified that he did not take any action to arrest the Defendants because he assumed that the federal system for procuring a defendant's arrest was the same as the system in Gwinnett County and that the Marshal's Service would handle the arrest without his involvement. (Donnelly Aff. ¶¶ 7-8; Tr2 42). TFO Donnelly did not inquire as to the process in the federal system. (Tr2 39). TFO Donnelly also had numerous opportunities to discover that the Marshal's Service would not be handling the arrest. TFO Donnelly knew within several months after the arrest warrant issued that the Defendants had not yet been arrested by the Marshal's Service, but still did little to ascertain what the process was in the federal system. While TFO

11

Donnelly elicited help from TFO Thompson, he did not follow through. (Donnelly Aff. ¶ 9; Tr. 32). TFO Donnelly testified that he asked TFO Thompson to follow up with the Marshal's Service to see "if anybody was even looking at it" and gave TFO Thompson copies of Defendants' arrest warrants. (Tr2 40; Donnelly Aff. ¶ 9). Nevertheless, even though TFO Thompson admits that he learned that the Marshal's Service was not responsible for arresting Defendants while looking into the matter for TFO Donnelly, he inexplicably maintains that he failed to communicate this fact to TFO Donnelly. (Tr. 33-34). TFO Thompson testified that he cannot remember the discussion that he had with TFO Donnelly when he returned the files to him, other than he thinks he conveyed some information he had written on the back of paperwork TFO Donnelly gave him, information he now does not remember. Yet TFO Thompson knows he did not tell TFO Donnelly that the FBI is responsible for handling its own arrests. (Tr. 34-42; Tr2 11). That TFO Donnelly and TFO Thompson never discussed the FBI's responsibility for handling its own arrests at the time of the discussion where TFO Thompson returned the files to TFO Donnelly defies logic. Despite having asked TFO Thompson to check with the Marshal's Service to see "if anybody was even looking at [the arrest warrants]," when TFO Thompson reported back to TFO Donnelly and returned the materials TFO Donnelly had given him, TFO Donnelly presumably did not inquire of TFO Thompson what the Marshal's Service was doing with the warrants. (Tr2 40). Despite the passage of time of nearly two years, TFO Donnelly never followed up with the Marshal's Service or inquired about the matter with his supervisors at the FBI. (Tr. 26; Tr2 40). Under

12

these circumstances, this Court has no difficulty concluding that this factor weighs in favor of the Defendants. Doggett, 505 U.S. at 657 (explaining that although negligence weighs less than deliberate attempt to harm the accused's defense, it still "falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun").

**B.    Defendants' Assertion of Right**

The third factor for consideration is the defendant's assertion of his right to a speedy trial. Villarreal, 613 F.3d at 1353-54. The defendant's assertion of his speedy trial right is entitled to strong weight in determining whether he is deprived of the right because a timely demand for speedy trial often supports the inference that the defendant was not at fault for the delay and that the delay prejudiced the defendant. Id. The defendant's failure to make a demand is not counted against him for periods in which he was unaware of the charges against him. Id. The Government concedes that the Defendants timely asserted their speedy trial rights and that this factor also weighs in Defendants' favor. (Gov't's Br., Doc. 89, at 16).

**C.    Prejudice**

Because all three of the Barker factors weigh against the Government, the Court is next tasked with determining whether the factors weigh heavily against the Government. Ingram, 446 F.3d at 1338. If the first three factors do not weigh heavily against the Government, then the Defendants must demonstrate actual prejudice in order succeed in proving a violation of their speedy trial rights. Ingram, 446 F.3d at 1338.

13

When determining whether the reason offered for the delay and the length of the delay weighs heavily against the Government, two seminal Eleventh Circuit cases guide the Court's analysis. In the first case, United States v. Clark, 83 F.3d 1350 (1996), the defendant was charged with six counts related to controlled substance violations and one count of carrying a firearm during a drug trafficking crime. Id. at 1351. A federal indictment was returned against Clark on September 7, 1993, but he was not arrested until over seventeen months later in February 1995. Id. Clark was unaware of the federal indictment and continually resided in the same apartment listed on the arrest warrant and attended classes at Alabama State University where he was eventually arrested while attending class. Id. The Montgomery Police Department had attempted to locate Clark on one occasion at his home but no one answered the door. Id. at 1352. The Montgomery Police Department suspended efforts to locate Clark following the attempt, under the impression that the Marshal's Service was taking over. Id. at 1352. There, the Government conceded that it was negligent in pursuing Clark, but argued that its lack of diligence was excusable because it was due to its erroneous assumption that the Marshal's Service was responsible for the arrest. Id. at 1353. The Eleventh Circuit Court of Appeals agreed with the Government, reversed the trial court, and found that the defendant must prove prejudice in order to establish that he suffered a violation of his speedy trial rights. Id. at 1353-54. The Court there reasoned that the Government's negligence stemmed not from a deliberate delay, but rather an erroneous assumption that the Marshal's Service had taken over the case. Id. at 1353. The Court further concluded

14

that the seventeen-month delay was significantly less than the eight-and-one-half-year-delay found intolerable by the Supreme Court in <u>Doggett v. United States</u>, 505 U.S. 647, 651-52 (1992), and was close to the fourteen and a half months of negligent Government delay found acceptable by the Fifth Circuit in <u>Robinson v. Whitley</u>, 2 F.3d 562 (5th Cir. 1993). <u>Clark</u>, 83 F.3d at 1353-54 (citing <u>United States v. Beamon</u>, 992 F.2d 1009, 1015 (9th Cir. 1993), for the proposition that seventeen to twenty-month delays solely attributable to Government negligence was insufficient to relieve defendants from showing actual prejudice). Thus, the Eleventh Circuit found that the district court had erred in excusing Clark from showing actual prejudice resulting from the delay. <u>Clark</u>, 83 F.3d at 1354.

In contrast, in <u>United States v. Ingram</u>, 448 F.3d 1332 (11th Cir. 2006), the Eleventh Circuit concluded that the Government's negligence in delaying the defendant's arrest weighed heavily against the Government. <u>Ingram</u>, 446 F.3d at 1339. In that case, Ingram, a convicted felon, attempted to purchase a firearm and lied on his application on February 28, 2000, when asked whether he had ever been convicted of a felony. 446 F.3d at 1334. The firearm owner submitted paperwork to the National Instant Criminal Background Check System, and the request to purchase the firearm was denied. <u>Id.</u> In March of the same year, a special agent with the Bureau of Alcohol, Tobacco, and Firearms ("ATF") began investigating the transaction. <u>Id.</u> By July 2000, the special agent interviewed Ingram at his place of employment where Ingram admitted that he was a convicted felon but had denied being a convicted felon on the application.

15

Id. at 1335. At that time, Ingram also gave the ATF special agent his home address and telephone numbers and told Ingram that his brother was a police officer with the City of Fort Lauderdale. Id. On October 25, 2002, more than two and a half years after the incident at the pawn shop, Ingram was indicted under federal law for making false statements to a firearms dealer in connection with an attempted acquisition of a firearm. Id. at 1335. The indictment was sealed on the same day that it was entered, and a warrant was issued for Ingram's arrest. Id. at 1335. The ATF special agent made only a minimal effort to arrest Ingram. Instead, the ATF special agent left some telephone messages for Ingram in 2002, and Ingram returned the special agent's calls. Id. at 1335. Although the special agent drove by Ingram's residence and place of work on several occasions, he never exited his car. Id. at 1335. After the special agent called Ingram's work on July 27, 2004, Ingram's coworker gave the special agent another number to use to call Ingram, the special agent left a message at this new number, and Ingram returned his call on July 28, 2004. Id. Ingram surrendered in court on August 3, 2004. Id.

In that case, the Eleventh Circuit concluded that the post-indictment delay, twice the threshold for presuming prejudice, weighed heavily against the Government. Id. at 1338-40. In reaching that conclusion, the Eleventh Circuit explained that it was appropriate to consider "*inordinate* pre-indictment delay" in determining how heavily post-indictment delay weighs against the Government. Id. at 1339. The Circuit reasoned that it was appropriate to do so because the "rationale for presuming prejudice is, after all, that 'excessive delay presumptively compromises the reliability of a trial in

16

ways that neither party can prove or, for that matter, identify.'" Id. at 1339.  Thus, the court found that the two-year post-indictment delay in Ingram weighed more heavily than a two-year delay in another case might if, in that case, the post-indictment delay began shortly after the allegedly criminal acts occurred. Id. at 1339.  Likewise, the court compared the case to Clark, *supra*, finding that the delay in Ingram was more weighty. Id. at 1339.  The Eleventh Circuit further concluded that the negligence also weighed more heavily against the Government than in Clark because the record in Ingram did not support any reasonable explanation for the Government's neglect in executing the warrant. Id. at 1339.  The Eleventh Circuit found that there was much more that the Government could have done to arrest Ingram and that the investigation was not performed diligently. Id.  The court noted that given the crime for which Ingram was indicted, the state of the proof on the date of the indictment, and the Government's knowledge of his whereabouts, the two-year post-indictment delay was intolerable. Id. The Court further explained that the delay that can be tolerated for an ordinary street crime was considerably less for a serious, complex conspiracy charge. Id.

This case falls squarely in between Ingram and Clark. Defendants have persuaded the Court that the Government's negligence in this case is every bit as culpable as that of the ATF special agent in Ingram.  The length of time of the delay in this case, however, does not weigh as heavily as it did in Ingram.  In this case and in Ingram, a nearly two-year post-indictment delay is at issue. But in this case, unlike Ingram, there is no *inordinate* pre-indictment delay to weigh against the Government. The Eleventh

17

Circuit has not yet provided much guidance as to what would amount to inordinate pre-indictment delay for purposes of the Sixth Amendment speedy trial analysis. Lower courts addressing the matter have considered and compared the complexity of the crime to the crime in Ingram and analyzed whether the crime was an ordinary street crime or involved a more complex conspiracy, analyzed whether, like in Ingram, the investigative delay extended beyond the point in time that the Government had everything it needed to bring an indictment, and evaluated whether reasonable investigative efforts were being performed diligently during the investigative period. See, e.g., Ingram, 446 F.3d at 1339 (citing a Second Circuit case for the proposition that the delay between the Government's discovery of the offense and its filing of the information is relevant); United States v. Gonzalez-Castro, No. 6:09-CR-142-Orl-36GJK, 2013 WL 3153979, at *18 (M.D. Fla. June 19, 2013) (finding that it was appropriate to weigh the post-indictment delay more heavily because the Government did not explain why it waited more than one year and nine months after the defendant confessed to obtain an indictment); United States v. Henao-Toro, No. 04-20065-CR, 2010 WL 1459472, at *12-13 (S.D. Fla. Apr. 12, 2010); United States v. Johnson, No. 05-00196-WS, 2009 WL 2612306, at *4 (S.D. Ala. Aug. 21, 2009).

The pre-indictment delay in this case is distinguishable from the pre-indictment delay found inordinate in Ingram. Here, the investigation was much more complex than the investigation in Ingram. Notably, in Ingram, there was a single defendant who engaged in a street crime. The investigation was simple. The investigation needed to

18

bring an indictment against Ingram consisted of a review of Ingram's criminal history and paperwork submitted by the gun dealer as well as interviews with the gun dealer and Ingram. Ingram, 446 F.3d at 1334-35. All of these steps of the investigation were accomplished by July 2000 and there is no indication that any further investigation occurred after that point. Id. at 1335. Nevertheless, the defendant was not indicted until more than two years later on October 25, 2002. Id.

In contrast, the investigation in the instant case did not involve a simple street crime and was not so compact. According to TFO Donnelly's investigative report and the Indictment, the crimes at issue here were believed to be committed by a conspiracy and involved multiple burglaries. The law enforcement officers here were not able to make their entire case from review of paperwork and a couple of witness interviews. Instead, the investigation in this case identified twenty-five witnesses, at least eight of whom were not associated with law enforcement, and almost one hundred exhibits. (Def. Oliva's Ex. 1, at GWPD - 000004-000016). Unlike the single-defendant case in Ingram, the investigation here identified nine suspects. (Def. Oliva's Ex. 1, at GWPD - 000040-000044, 000057-000061). Moreover, the investigation in this case included the execution of at least seven search warrants, a grand jury subpoena, and court orders so that law enforcement could obtain cellular phone data, phone records, and cell tower analysis. (Def. Oliva's Ex. 1, at GWPD - 000011-000015). The investigation also included scientific analysis of shoe tread patterns, cellular phone analysis and forensic reports, cellular tower analyses, SIM card analysis, review of surveillance footage,

19

fingerprint and DNA analysis, multiple witness interviews, analysis of criminal histories, and translation of text messages from Spanish. (Id. at 000011-000015, 000019, 000021, 000025-000027, 000033, 000046-000056). Unlike the investigation in Ingram, which appeared to be completed more than two years and three months before the indictment was obtained, the investigation here appeared to continue almost until the time the Indictment was obtained. (See Def. Oliva's Ex. 1, at GWPD-000056 (indicating that TFO Donnelly obtained three search warrants on February 22, 2013, in order to obtain the text messages on several suspects' telephones and subsequently had the text messages translated by a linguistics analyst); Gomez Uranga's Ex. H (driver's record information obtained in mid-June 2013); Gomez Uranga's Ex. I (driver's license information dated mid-August, 2013)). There is no indication that parts of the investigation were unnecessary or purposefully done to delay Indictment. Furthermore, the parties have not created any record or presented any argument tending to show that the evidence needed to obtain an indictment was amassed well in advance of the Indictment or that the period of the investigation prior to the Indictment included *inordinate* delay. Futhermore, Defendants have not shown that any portion of time during which federal prosecutors analyzed whether the cases against the Defendants should brought before the Grand Jury and to prepare the cases to be brought before the Grand Jury amounted to inordinate delay. For all of these reasons, this Court concludes that the pre-indictment investigation period here did not count as "inordinate" pre-indictment delay.

20

As a result, the Court cannot conclude that the post-indictment delay weighs heavily against the Government. The amount of delay is analyzed on a case-by-case basis and no case law in the Eleventh Circuit has precisely defined what amount of delay would weigh heavily against the Government. Clark, 83 F.3d 1350. While the undersigned is very troubled by the Government's gross negligence in this case, because there was no inordinate pre-trial delay in this case, the twenty-two months of post-indictment delay between the Indictment and the Defendants' arrests resembles the seventeen and a half months of post-indictment delay in Clark instead of the more than four years combined pre-indictment and post-indictment delay in Ingram. Compare Clark, 83 F.3d at 1353-54 (citing United States v. Beamon, 992 F.2d 1009, 1015 (9th Cir. 1993), for the proposition that seventeen to twenty-month delays solely attributable to Government negligence was insufficient to relieve defendants from showing actual prejudice); with Ingram, 446 F.3d at 1335 (finding that the twenty-two months of post-indictment delay weighed heavily against the Government because given that there was two and a half years of inordinate pre-indictment delay, the post-indictment delay was more prejudicial to the defendant); see also United States v. Bibb, 194 F. App'x 619, 622 (11th Cir. 2006) (finding that eighteen months of delay between indictment and arrest due to Government negligence in locating and arresting the defendant did not weigh heavily against the Government and did not excuse the defendant from demonstrating actual prejudice resulting from the delay). Thus, this Court finds that the amount of delay does not heavily favor the Defendants and Defendants must prove

21

actual prejudice in order to establish a violation of their right to a speedy trial.  Indeed, courts from outside this Circuit have uniformly rejected the defendants' arguments that similar delays excuse them from proving actual prejudice.  Jackson v. Ray, 390 F.3d 1254, 1263 (10th Cir. 2004) (concluding that unexplained delay of four and one-third years did not excuse defendant from having to prove actual prejudice); United States v. Jackson, 473 F.3d 660, 667-68 (6th Cir. 2007) (holding that twenty-one-month delay between indictment and arrest not enough to excuse the defendant from demonstrating actual prejudice where Government did not give a good reason for the delay); United States v. Serna-Villareal, 352 F.3d 225, 232-33 (5th Cir. 2003) (concluding that at least three-year delay caused by the Government's negligence was too short to weigh heavily in favor of a finding of presumed prejudice); United States v. Beamon, 992 F.2d 1009, 1013-14 (9th Cir. 1993) (explaining that twenty-month delay between indictment and arrest caused by the Government's negligence did not excuse requirement that defendant prove actual prejudice); United States v. Martin, No. 2:08-CR-0060-GMN-LRL, 2010 WL 5575324, at *2 (D. Nevada Oct. 12, 2010) (finding that twenty-seven-month delay not enough to relieve defendant of proving actual prejudice even though the Government made virtually no attempt to locate or apprehend the defendant during period of delay).

Because the first three Barker factors do not weigh heavily against the Government, Defendants must demonstrate that they suffered actual prejudice resulting from the delay to establish their speedy trial violation. The prejudice suffered by the defendant is evaluated in light of the three interests of the defendant to a speedy trial:

22

"(1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired." Villarreal, 613 F.3d at 1355.  The most important factor is the possibility that the defense will be impaired because the inability of a defendant to adequately prepare his case "skews the fairness of the entire system." Villarreal, 613 F.3d at 1355.  The defendant must proffer more than conclusory assertions of prejudice or unsubstantiated allegations of witnesses' faded memories. United States v. Woodley, 484 F. App'x 310, 319 (11th Cir. 2012); United States v. Hayes, 40 F.3d 362, 366 (11th Cir. 1994).

Defendants Vidal and Oliva do not attempt to demonstrate any actual prejudice resulting from the delay in this case.  Defendant Gomez Uranga contends that he can demonstrate actual prejudice due to his anxiety and concern because when the state court case against him was dismissed in 2014, the dismissal notice informed him that the United States Attorney's Office was going to prosecute him for his role in a criminal enterprise whose activities included the state crimes. (Doc. 47, at 7). Defendant Gomez Uranga contends that as a result, he did not know he had been indicted, but knew that a prosecution was forthcoming and endured the anxiety of knowing that he had a federal prosecution "hanging over his head."  Defendant Gomez Uranga asserts, through the argument of counsel, that he could not make long-term plans because he did not know when the prosecution would upend his life.  Defendant Gomez Uranga further contends that "every day when he sent his kids to school, he had to worry that he could be whisked off to jail before [his kids] returned in the afternoon."  (Doc. 81, at 12).

23

Defendant Gomez Uranga, however, presents no evidence beyond the conclusory argument of counsel concerning the alleged distress and anxiety suffered. Thus, there is no evidence here that Defendant Gomez Uranga would have been less anxious had his arrest been timely. Even if Defendant Gomez Uranga had been timely arrested, it is just as likely that his time with his family would have been equally marred by the certainty of arrest and prosecution. Likewise, Defendant Gomez Uranga's plans for his future and his family would have been plagued earlier with the possibility that the prosecution could lead to his conviction. Without more, it is also not clear how much of Defendant Gomez Uranga's alleged anxiety stemmed from the delay or the anxiety and strain normally attendant with an impending prosecution. Accordingly, Defendant Gomez Uranga's conclusory allegations of anxiety here are not sufficient to establish that he suffered actual prejudice resulting from delay. See, e.g., Woodley, 484 F. App'x at 319-20 (explaining that the defendant's conclusory assertions of unsanitary prison conditions and inability to access a law library, without more, were insufficient to establish actual prejudice); Hayes, 40 F.3d at 366 (conclusory allegations of prejudice insufficient); United States v. Avalos, 541 F.2d 1100, 1115 (5th Cir. 1976) ("Anxiety of the sort present to some degree in virtually every case does not amount to actual prejudice."); United States v. Graham, 538 F.2d 261, 265 (9th Cir. 1976) (rejecting the defendant's conclusory allegations of prejudice resulting from general anxiety and strain exacerbated by the strain of the delay of the trial and finding that such allegations of anxiety and strain normally attend any criminal prosecution). Under these circumstances, this Court

24

AO 72A
(Rev.8/82)

is not persuaded that Defendant Gomez Uranga suffered actual prejudice as a result of the delay in his arrest. Given that the Court cannot find that the first three <u>Barker</u> factors weigh heavily against the Government and because the Defendants cannot demonstrate actual prejudice, they cannot prevail in establishing a violation of their right to a speedy trial. <u>Bibb</u>, 194 F. App'x at 623; <u>Ingram</u>, 446 F.3d at 1337. While this Court agrees with Defendants that the Government's negligent delay in this case is very troubling, based upon the legal precedents established in this Circuit and beyond, this Court does not find that Defendants have established a violation of their speedy trial rights. Accordingly, this Court **RECOMMENDS** that Defendants' Motions to Dismiss the Indictment be **DENIED**. (Docs. 37, 45, 61).

## CONCLUSION

Based on the aforementioned reasons, this Court **RECOMMENDS** that Defendants' Motions to Dismiss the Indictment for Violation of the Right to Speedy Trial be **DENIED**. (Docs. 37, 45, 61). Defendant Oliva's Motion to Adopt Co-Defendants' Motions to Dismiss and Related Pleadings to Dismiss the Indictment for Violation of the Right to Speedy Trial is **GRANTED**. (Doc. 58). Because there are no more motions or other matters to address for Defendant Vidal, the undersigned certifies Defendant Vidal ready for trial.

AO 72A
(Rev.8/82)

**SO ORDERED and REPORTED AND RECOMMENDED**, this _9_ day of

September, 2016,

_____
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)