iIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CRIMINAL ACTION NO. |
| | : | 1:13-CR-0463-LMM |
| v. | : | |
| | : | |
| RAFAEL GOMEZ URANGA, DAVID | : | |
| LAZARO OLIVA, and ORLANDO | : | |
| VIDAL, | : | |
| | : | |
| Defendants. | : | |

## ORDER

This matter is before the Court on the Magistrate Judge's Report and
Recommendation ("R&R"), Dkt. No. [95], recommending that the Court deny
Defendants' Motions to Dismiss the Indictment for Violation of the Right to
Speedy Trial, Dkt. Nos. [37, 45, 61]. Pursuant to 28 U.S.C. § 636(b)(1), all
Defendants filed objections to the R&R. Dkt Nos. [99-101]. After due
consideration, the Court enters the following Order:

## I.    BACKGROUND[1]

This case involves a burglary of a SouthernLinc warehouse on October 23,
2011, and the attempted burglary of a second warehouse belonging to Max Group
on November 28, 2011. Dkt. No. [1] ¶ 1. On or about November 21, 2011, the
Federal Bureau of Investigation ("FBI") opened an investigation into the two

---

[1] The facts recited in this section are undisputed unless otherwise noted.

burglaries.[2] Dkt. No. [46-1] ¶ 2. On or about March 27, 2012, FBI Task Force Officer Michael Donnelly was assigned as the sole investigator in the case. Id. ¶ 3. This was the first time Donnelly had been given such an assignment. Id.

On November 25, 2013, over two years from the first burglary, a grand jury sitting in the Northern District of Georgia returned a two count indictment against Defendants Uranga, Oliva, and Vidal. See Dkt. No. [1]. The Indictment was sealed that same day and arrest warrants for Defendants were issued. Dkt. No. [3] (Order sealing Indictment); Dkt. Nos. [5, 7, 9] (arrest warrants).

It is undisputed that from the time the arrest warrants were issued, it was Donnelly's responsibility to locate and arrest Defendants. Dkt. No. [46-1] ¶ 10. However, he claims that he mistakenly believed the United States Marshals Service ("USMS") was responsible for locating and arresting Defendants and that they would enter Defendants into the National Crime Information Center ("NCIC"), used by law enforcement to determine whether an individual has an outstanding arrest warrant.[3] Id. ¶ 7. Donnelly claims it was not until a meeting with his supervisor in late September 2015 that he learned he was responsible for locating and arresting Defendants and for entering their names into the NCIC. Id. ¶ 10.

---

[2] The Court notes that, throughout the briefing for these Motions, and in the R&R itself, the investigation into *both* burglaries is said to have begun before the second burglary. Presumably the investigation began with the first burglary only but then incorporated the second burglary once it was committed.

[3] While Defendants question how Donnelly could not have known about the FBI procedure for effectuating an arrest warrant, they do not specifically object to Donnelly's claim that his understanding of the procedure was mistaken.

Donnelly admits, however, that before he found out about the FBI procedure, but several months after the Indictment was issued, he realized nothing was happening in the case.[4] Id. ¶ 9. He conferred with Josh Thompson, another Task Force Officer who had recently worked for the USMS. Id. Donnelly gave Thompson copies of the arrest warrants and possible locations of Defendants. Id. He asked Thompson to communicate with the USMS to encourage them to locate Defendants. Id.

At an evidentiary hearing held by the Magistrate Judge, Thompson testified about his role in the case. Dkt. No. [76]. He remembered calling someone from the USMS and learning that Marshals are not responsible for effectuating arrest warrants when the case is controlled by the FBI. Id. at 33:24-34:1. He testified that it may have been within a day or a month from when Donnelly gave him the warrants that Thompson discovered this information. Id. at 40:6.

Thompson then testified that, after a month of receiving the warrants, he realized he had not given the papers back to Donnelly. Id. at 40:6-7. He then took the warrants back to Donnelly and discussed some information that neither Officer can now recall. Id. at 40:6-9. However, Thompson admits that he did *not* inform Donnelly that the FBI handles its own arrest warrants. Id. at 40:23-25. Additionally, Thompson testified that Donnelly never asked him about the

---

[4] The parties appear to agree that Donnelly noticed the case was stalled around January of 2014.

procedure or whether the Marshals would begin locating Defendants. Id. at 42:1-16.

After this discussion, Donnelly did not do anything in the case until the meeting with his supervisors in late September of 2015; nearly 21 months after the Indictment was issued. Dkt. No. [46-1] ¶ 10. However, within 24 hours of learning the FBI procedure, Donnelly entered Defendants into the NCIC and began searching for Defendants' location. Id. ¶¶ 11-12.

On October 9, 2015, Defendants Vidal and Uranga were arrested in the Southern District of Florida. Id. ¶ 17. On October 13, 2015, Defendant Oliva was arrested in the Southern District of New York. Id. ¶ 18.

Defendants each filed Motions to Dismiss for Violation of the Right to Speedy Trial. Dkt. Nos. [37, 45, 61]. The Government objected and the Magistrate Judge recommended that the Court deny Defendants' Motions. Dkt. No. [95]. Defendants objected to the Magistrate Judge's R&R for several reasons. The Court will discuss each objection.

## II.   LEGAL STANDARD

Under 28 U.S.C. § 636(b)(1), the Court reviews the Magistrate's Report and Recommendation for clear error if no objections are filed to the report. 28 U.S.C. § 636(b)(1). If a party files objections, however, the district court must determine de novo any part of the Magistrate Judge's disposition that is the subject of a proper objection. Id.; FED. R. CRIM. P. 59(b)(3). As Defendants filed objections to the R&R with respect to its findings regarding and analysis of Defendants'

4

Motions, the Court reviews the Magistrate Judge's findings and recommendations regarding these conclusions on a *de novo* basis, including the Magistrate Judge's findings of fact. 28 U.S.C. § 636(b)(1).

## III.   DISCUSSION

As discussed above, Defendants have filed several objections to the Magistrate Judge's finding that no Speedy Trial violation occurred. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. CONST. amend. VI. The Sixth Amendment recognizes that delay between arrest, indictment, and trial may unconstitutionally prejudice a defendant's defense. U.S. v. MacDonald, 456 U.S. 1, 8 (1982). However, the Amendment is "not primarily intended to prevent prejudice to the defense caused by the passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations." Id. Instead, the Sixth Amendment "is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." Id.

In determining whether a post-indictment delay has caused a Speedy Trial violation, courts look to the four-factor balancing test established in Barker v.

Wingo, 407 U.S. 514 (1972).[5] The factors used in the balancing test are: (1) the length of delay; (2) the reason for delay; (3) the defendant's assertion of the speedy trial right; and (4) prejudice to the defendant. Barker, 407 U.S. at 530.

For the first factor, the defendant must allege "that the interval between accusation and trial has crossed the threshold dividing ordinary and presumptively prejudicial delay. Doggett v. U.S., 505 U.S. 647, 651-51 (1992). If the defendant is able to satisfy this threshold inquiry, only then does the court analyze the remaining factors. Id.

In this Circuit, post-indictment delays exceeding one year are generally considered presumptively prejudicial. Ingram, 446 F.3d at 1336; U.S. v. Clark, 83 F.3d 1350, 1352 (11th Cir. 1996). In this instance, the parties agree that the twenty-two month delay between Indictment and Defendants' arrests satisfies this threshold inquiry for the first factor (length of delay). As a result, the Magistrate Judge analyzed the remaining Barker factors.

---

[5] Defendants make several arguments regarding the *pre*-indictment delay from when the crimes were committed to when the Indictments were issued. However, pre-indictment delays do not constitute violations of the right to Speedy Trial. See MacDonald, 456 U.S. at 6 ("On its face, the protection of the Amendment is activated only when a criminal prosecution has begun . . . [and does not] require the Government to discovery, investigate, and accuse any person within any particular period of time.") (quoting U.S. v. Marion, 404 U.S. 307, 313 (1971)). Pre-indictment delays can, however, be used to inform the Barker factors discussed below. See U.S. v. Ingram, 446 U.S. 1332, 1339 (11th Cir. 2006) ("[O]nce the Sixth Amendment's speedy trial analysis is triggered, it is appropriate to consider inordinate pre-indictment delay in determining how heavily post-indictment delay weighs against the Government.").

Importantly, under Eleventh Circuit law, if the first three factors "weigh heavily against the Government, the defendant need not show actual prejudice (the fourth factor) to succeed in showing a violation of his right to speedy trial." Ingram, 446 F.3d at 1336. However, if the factors do not weigh heavily against the Government, even if they still weigh against the Government, then the defendant must show actual prejudice.[6] Id.

Turning to the second factor, reason for delay, the Government bears the burden of establishing valid reasons for delay. Ingram, 446 F.3d at 1337. Courts must allocate different weight to different reasons for delay. U.S. v. Villarreal, 613 F.3d 1344, 1351 (11th Cir. 2010). Specifically, the Supreme Court has grouped possible reasons for delay into three general categories: valid, improper, or neutral. See Barker, 407 U.S. at 527, 531.

Valid reasons weigh in favor of the Government. See Villarreal, 613 F.3d at 1351. Improper reasons weigh heavily against the party responsible for the misconduct. See Barker, 407 U.S. at 531. And neutral reasons are weighted against the Government, "since the ultimate responsibility for such circumstances must rest with [it] rather than with the defendant." Id. However, neutral reasons are weighted less heavily than improper reasons. Id.

---

[6] The Court notes that the parties agree that the first and third factors are met. "Thus, [the Court] assume[s] *arguendo* that both factors weigh heavily against the government." U.S. v. Woodley, 484 F. App'x 310, 319 (11th Cir. 2012). As such, if the Court were to find that the second factor weighed heavily against the Government, then all three factors would weigh heavily against the Government, relieving Defendants of their need to show actual prejudice.

Examples of valid reasons include: missing witnesses, <u>Barker</u>, 407 U.S. at 531; incompetency of the defendant, <u>Danks v. Davis</u>, 355 F.3d 1005, 1009 (7th Cir. 2004); extradition effort by the government to obtain custody of the defendant, <u>U.S. v. Blanco</u>, 861 F.3d 773, 778-79 (2d Cir. 1988); the unavailability of a co-defendant in a joint trial, <u>U.S. v. Tranakos</u>, 911 F.3d 1422, 1428 (10th Cir. 1990); the illness of an essential witness, <u>U.S. v. Twitty</u>, 107 F.3d 1482, 1490 (11th Cir. 1997); and a prior mistrial, <u>U.S. v. Hall</u>, 551 F.3d 257, 272 (4th Cir. 2009).

Some examples of neutral reasons include negligence on the part of the Government and overcrowded courts. <u>Barker</u>, 407 U.S. at 531. An example of improper reasons includes deliberate attempts by the Government to delay the trial "to hamper the defense." <u>Id.</u> Additionally, "the government's failure to pursue a defendant diligently will weigh against it, more or less heavily depending on if the government acted in good or bad faith." <u>Villarreal</u>, 613 F.3d at 1351. <u>See</u> <u>U.S. v. Bibb</u>, 194 F. App'x 619, 622 (11th Cir. 2006) ("Government actions that are tangential, frivolous, dilatory, or taken in bad faith weigh heavily in favor of finding that the speedy trial violation occurred.").

In this case, the Magistrate Judge found that the Government was grossly negligent in effectuating the arrest warrants post-indictment. Gross negligence, alone, does not weigh heavily against the Government. <u>See</u> <u>Barker</u>, 407 U.S. at 531; <u>Villarreal</u>, 613 F.3d at 1351; <u>Bibb</u>, 194 F. App'x at 622. Instead, post-indictment delay constituting gross negligence, such as that occurring here, should be evaluated in conjunction with the pre-indictment delay.

The Magistrate Judge analyzed the pre-indictment delay to determine whether it pushed the post-indictment delay into "improper" territory. However, the Magistrate Judge found that the pre-indictment delay was not inordinate given the complexity of the case and efforts of the Government such that the post-indictment delay would not weigh heavily against the Government.

The Magistrate Judge's conclusion turned on an analysis of U.S. v. Ingram in which the Eleventh Circuit found a two year pre-indictment delay coupled with a two year post-indictment delay violated the defendant's right to speedy trial. Ingram, 446 F.3d at 1339. While mechanically looking at the length of Defendants' post- and pre-indictment delays in relation to Ingram would have led the Magistrate Court to conclude a speedy trial violation occurred, the Magistrate Court instead compared the reasoning, facts, and circumstances of Ingram with the facts and circumstances of this case. This led the Magistrate Judge to determine that the pre-indictment delay in this case was unlike the pre-indictment delay in Ingram such that this particular Barker factor did not weigh heavily against the Government.

In Ingram, the defendant, a convicted felon, attempted to purchase a firearm at a pawnshop. Id. at 1334. In doing so, he completed and signed a legal form attesting he had never been convicted of a felony. Id. When the pawnshop submitted the defendant's form to the National Instant Criminal Background Check System, the application was denied. Id. As a result, in March of 2000, Special Agent Kunz began investigating the transaction. Id. First, Kunz spoke to

9

the pawnshop owner. Id. Then, in July of 2000, Kunz interviewed the defendant at his place of employment. Id. at 1335. The defendant admitted to Kunz that he was a convicted felon and that he had attested he was not a convicted felon on the firearm form. Id. The defendant gave Kunz his cell and home phone number as well as his home address. Id. Additionally, he informed Kunz that his brother was a police officers in the area. Id.

Kunz later turned in his investigative report to the U.S. Attorney's office that summer but did not hear anything else about it for over two years. Id. When he checked with the U.S. Attorney's office in 2002, Kunz was told that the case had been misplaced. Id. On October 25, 2002, over two and half years after the incident, the defendant was indicted for violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2). Id.

In analyzing the delay, the Eleventh Circuit clarified that "there is no hard and fast rule to apply here, and each case must be decided on its own facts." Id. at 1338. While the Eleventh Circuit mostly focused on the two year post-indictment delay, it did find that, "[a]fter a review of the record," the investigation into the defendant was not "performed diligently." Id. at 1339.

In analyzing Ingram, the Magistrate Judge conceded that the Eleventh Circuit has not provided detailed guidance about what exactly makes a pre-indictment delay inordinate. However, the Magistrate Judge accurately determined that many lower courts grappling with this issue compare the complexity of the crime at issue with the complexity of the crime in Ingram.

10

For instance, in <u>United States v. Henao-Toro</u>, No. 04-20065-CR, 2010 WL 1459472, at *13 (S.D. Fla. April 12, 2010), the Southern District of Florida determined that the five-year pre-indictment delay was not inordinate as compared to the two-year pre-indictment delay in <u>Ingram</u>. <u>Henao-Toro</u>, 2010 WL 1459472 at *13. Specifically, the court determined that its case "was not an ordinary street crime but a large drug trafficking conspiracy stretching from Colombia, to Jamaica, to the Bahamas into the United States." <u>Id.</u>

Similarly, in <u>United States v. Valiente</u>, No. 04-20046-CR, 2009 WL 1313198, at *12 (S.D. Fla. May 12, 2009), the same court determined that a four-year pre-indictment delay was not inordinate because it resulted from "the complexity of the IRS investigation into the allegations of tax fraud . . . which resulted in charges being filed against Defendant and three additional co-defendants and involved claims filed by 32 separate individuals." <u>Valiente</u>, 2009 WL 1313198 at *12. Additionally, the court took into account "the issuance of two search warrants and the issuance of summonses for bank records, as well as [at] least 12 interviews with Defendants, her eventual co-defendants, and various witnesses." <u>Id.</u> "Following a two-year investigation," the agent submitted her report and it was reviewed by her superiors for another two years, as per IRS protocol. <u>Id.</u>

In concluding that the pre-indictment delay in this case was not inordinate, the Magistrate Judge looked at the complexity of the two crimes, the type of investigation that ensued, and whether Donnelly was diligent in his investigation

of the crimes. In <u>Ingram</u>, the defendant had simply lied on a firearm application. In this case, Defendants are allegedly part of a large conspiracy crossing state lines. In <u>Ingram</u>, the investigation was relatively simple, with the investigating officer discovering rather quickly who had committed the crime and where to find him, yet waiting two years to seek an indictment. In this case, however, the Magistrate Judge determined that there were 25 witnesses, over 100 exhibits, multiple search warrants, a grand jury subpoena, analysis of phone records, and scientific analysis of shoe tread patterns. As a result, the Magistrate Judge found that the cases were different and Defendants' pre-indictment delay was not inordinate.

After determining that the pre-indictment delay was not inordinate, the Magistrate Judge focused on whether the post-indictment delay, on its own, weighed heavily against the Government. In making that determination, the Magistrate Judge found that this case closely resembled <u>United States v. Clark</u>, 83 F.3d 1350 (11th Cir. 1996).

In <u>Clark</u>, the defendant was arrested on July 1, 1993, for allegedly selling narcotics to an informant. <u>Clark</u>, 83 F.3d at 1351. A federal indictment was returned against the defendant on September 7, 1993. <u>Id.</u> However, the defendant was not arrested under the indictment until February 22, 1995, over 17 months after the indictment was issued. <u>Id.</u>

Prior to the time of the indictment until his arrest, the defendant lived in the same apartment listed on the arrest warrant. <u>Id.</u> The only attempt to arrest

the defendant prior to his actual arrest occurred when a city police officer knocked on his door and left when no one answered. Id. At that point, the city police suspended efforts to arrest the defendant, apparently under the impression that the USMS would take over. Id.

In analyzing the reason for the 17-month delay, the Eleventh Circuit determined there was no evidence that the defendant attempted to elude authorities or that he was even aware of the indictment at the time of his arrest. Id. at 1352. In fact, it appeared to the Eleventh Circuit that the defendant "was well within the considerable reach of the Government during the entire 17-month period between his indictment and eventual capture." Id.

Nonetheless, the Eleventh Circuit concluded that there was no evidence the Government acted in bad faith. Id. Instead, the Eleventh Circuit found that the reason for the post-indictment delay was entirely due to the police's erroneous belief that the USMS would effectuate the arrest. Id. As such, the Eleventh Circuit determined that the second Barker factor did not weigh heavily against the Government. Id.

Because the Magistrate Judge determined that the reason for the post-indictment delay in this case resembled the post-indictment delay in Clark, it required Defendants to demonstrate that they experienced actual prejudice. In their Motions, only one Defendant, Uranga, argued that he suffered actual prejudice. Nonetheless, the Magistrate Judge found that it was not prejudice related to the alleged Speedy Trial violation. Instead, the prejudice was simply

the type of prejudice any defendant would experience waiting for trial. As a result, the Magistrate Judge recommended that the Court deny their Motions.

In response to the R&R, Defendants have separately asserted multiple objections. The Court has carefully reviewed the Magistrate Judge's application of both the Ingram and Clark cases and agrees with the Magistrate Judge's conclusions and interpretation of these Eleventh Circuit cases as explained in the Court's analysis of each objection below.

### a.  Defendant Vidal's Objections

Defendant Vidal has made four objections to the Magistrate Judge's R&R. They are: (1) that the Magistrate Judge erred when concluding that the Government's actions/inactions in failing to arrest Defendants were grossly negligent but did not lack due diligence; (2) the Magistrate Judge erred when improperly shifting the burden to the Defendants by requiring Defendants to prove the pre-indictment delay was the Government's fault and improperly gave weight to the pre-indictment delay; (3) the Magistrate Judge erred when concluding that the post-indictment delay does not weigh heavily against the Government; and (4) the Magistrate Judge erred when concluding that Defendants had to demonstrate that they suffered actual prejudice resulting from the post-indictment delay.

### i.  *Gross negligence vs. Lack of due diligence*

Vidal first argues that the Magistrate Judge erred when she found the Government's delay was due to gross negligence rather than a lack of diligence.

He argues that, if the Magistrate Judge had found the delay was based on a lack of diligence, the second Barker factor would have weighed heavily against the Government, negating the need to find actual prejudice.

In Villarreal, the Eleventh Circuit, relying on Barker, held that the Government's "failure to pursue a defendant diligently will weigh against it, more or less heavily depending on if the government acted in good or bad faith." Villarreal, 613 F.3d at 1351. In other words, if the Government fails to pursue the defendant diligently for "bad faith" reasons, then the factor weighs heavily against the Government. If, however, the failure was not a result of bad faith, the factor does not weigh *heavily* against the Government.

In this instance, Vidal has provided several examples as to why the failure was due to a lack of due diligence. However, he fails to explicitly argue that the failure occurred because of bad faith. Additionally, the Court's review of the record does not show that the Government acted in bad faith. Instead, it appears that Donnelly took *some* active steps to effectuate the arrest warrant, even if his attempts were unduly lacking. Additionally, there is no evidence that Donnelly failed to effectuate the arrests purposefully for any bad faith reasons.

While the Government may have exercised a lack of due diligence, its failure does not amount to bad faith and therefore the factor does not weigh heavily against the Government. As such, Vidal's first objection is overruled.

15

### ii.  *The burden of the pre-indictment delay*[7]

Vidal next argues that the Magistrate Judge erred by placing the burden to prove an inordinate pre-indictment delay on Defendants. Specifically, Vidal challenges two related findings. First, Vidal challenges the Magistrate Judge's assertion that "the parties have not created any record or presented any argument tending to show that the evidence needed to obtain an indictment was amassed well in advance of the Indictment or that the period of the investigation prior to Indictment included *inordinate* delay." Dkt. No. [99] at 5-6 (emphasis in original). According to Vidal, this statement impermissibly places part of the burden on Defendants to prove that the pre-indictment delay was inordinate when, legally, the burden is completely on the Government to prove the delay was *not* inordinate. See Ingram, 446 F.3d at 1337 ("[T]he burden is on the prosecution to explain the cause of the pre-trial delay.").

Next, Vidal challenges the Magistrate Judge's finding that "Defendants have not shown that any portion of the time during which federal prosecutors analyzed whether the cases against the Defendants should be brought before a Grand Jury and to prepare the case to be brought before the Grand Jury amounted to inordinate delay." Dkt. No. [99] at 6. Again, Vidal argues that this

---

[7] Vidal labels this objection "The Magistrate Judge Improperly Shifted The Burden To The Defendants . . . And Improperly Gave Weight To The Inordinate Pre-Indictment Delay." Dkt. No. [99] at 5. However, in that section, Vidal never discusses the weight of the delay. As such, this issue is not before the Court.

16

finding impermissibly places the burden on Defendants to show the delay was inordinate.

While it is true that the burden is not on Defendants to prove inordinate delay, Defendants' lack of evidence was not the only reason for the Magistrate Judge's finding. Instead, the Magistrate Judge relied on the Government's ample evidence already on the record demonstrating that the investigation was actively pursued for the entire two years before indictment. See Dkt. No. [95] at 20 (citing evidence showing Donnelly's active investigation up until indictment). As discussed above, the Magistrate Judge looked at the number of witnesses that were interviewed, the type of scientific analyses used by investigators, the number of exhibits amassed, and the numerous Grand Jury subpoenas. Id.

While Vidal may have read the R&R as finding that Defendants had to produce evidence as a matter of law, instead, the R&R simply suggested that Defendants did not produce rebutting evidence that would have nullified the evidence already on the record.

Nonetheless, even if the R&R impermissibly placed the burden on Defendants, the Court finds that the evidence on record shows that the pre-indictment delay was not inordinate given the complexity of the case and the fact that the investigation continued almost until the time the Indictment was obtained. See e.g., Dkt. No. [48-1] at 20 (information requested by Donnelly in November of 2012, regarding Defendants' alleged U-Haul rental in November of 2011); Id. at 41 (official FBI record created by Donnelly in December of 2012

17

listing potential suspects); Id. at 43 (Gomez Uranga's driving record obtained by Donnelly in mid June of 2013); Id. at 44 (Gomez Uranga's license information obtained by Donnelly in mid August of 2013); Dkt. No. [46-1] ¶ 3 ("From March 27, 2012, going forward, I diligently investigated the case, gathering evidence and interviewing victims."); Dkt. No. [103-2] (report by Donnelly chronicling the investigation's timeline from the date of the burglaries until the time of the report, created at least after February 22, 2013, the date of the last request for information).

In particular, Donnelly's investigative report describes a lengthy and complicated investigation with multiple suspects, inquiries, and search warrants. See Dkt. No. [103-2]. While some of the evidence that led Donnelly to recommend federal indictment for Defendants was gathered early in the investigation, the report shows that Donnelly was collecting important evidence at least until June of 2013, when he obtained Uranga's driving record. Dkt. No. [48-1] at 44. There is no indication that the information was not necessary or that Donnelly could have gathered it earlier in the investigation. The report, coupled with the documents demonstrating the steps Donnelly and other investigators took, shows that the pre-indictment delay was not inordinate.

### iii.  *Weight of the post-indictment delay*

Vidal next argues that, because the pre-indictment delay was actually inordinate, or at least the Government has not proven it was *not* inordinate, the Magistrate Judge should have found that the second Barker factor weighed

18

heavily against the Government. As discussed above, the Eleventh Circuit holds that when a pre-indictment delay is inordinate, the post-indictment delay weighs heavily against the Government. <u>Ingram</u>, 446 U.S. at 1351.

However, for the reasons explained *supra*, the pre-indictment delay was not inordinate. As such, the Magistrate Judge properly weighed the second factor against the Government.

### iv.  Actual prejudice

Vidal argues that, because the <u>Barker</u> factors weigh heavily against the Government, the Magistrate Judge erred in finding that he had to prove actual prejudice. However, as discussed above, the factors do not weigh heavily against the Government. As such, Vidal's objection is overruled.

### b.  Defendant Uranga's Objections

Unlike Defendant Vidal, Defendant Uranga makes one broad objection to the Magistrate Judge's R&R. Uranga generally argues that the <u>Barker</u> factors require dismissal of the indictment. In coming to that conclusion, Uranga focuses on the second and fourth factors.

### i.  Second factor: Reason for delay

Like Vidal, Uranga argues that the Magistrate Judge should not have found that the Government's actions were simply negligent. Instead, Vidal argues, Donnelly's actions were dilatory and thus weigh heavily against the Government.

As discussed above, "Government actions that are tangential, frivolous, *dilatory*, or taken in bad faith weigh heavily in favor of finding that the speedy

trial violation occurred." Bibb, 194 F. App'x at 622 (emphasis added). Uranga argues that the Magistrate Judge's factual findings only allow for a finding of dilatory motive.[8]

As support, Uranga points to the R&R where the Magistrate Judge says Donnelly's actions were "inexplicabl[e]" and "defie[d] logic." Dkt. No. [95] at 12. Uranga argues that this language demonstrates that the Magistrate Judge actually discredited Donnelly's testimony and therefore should not have credited his excuses. Instead, Uranga urges, the Magistrate Judge should have simply found that Donnelly's actions were dilatory.

The Court disagrees. The Magistrate Judge did not automatically discredit Donnelly's testimony by stating that his actions were inexplicable or defied logic. In fact, she never says that she has discredited his testimony. Her words simply acknowledge that Donnelly's actions were extremely careless as to be grossly negligent.

Uranga then argues that, even if the Magistrate Judge's language does not discredit Donnelly, the Magistrate Judge still should have found he was dilatory. Black's Law Dictionary defines "dilatory" as, "Designed or tending to cause

---

[8] Uranga also argues that, if the Government's actions were not dilatory, they at least demonstrate a lack of due diligence, which, he argues weighs heavily against the Government. However, as discussed above, lack of diligence on its own does not weigh heavily against the Government. Instead, a bad faith lack of diligence weighs heavily against the Government. Both Vidal and Uranga state that simple lack of diligence is enough. However, a review of the precedent in this Circuit requires the Court to find *bad faith* lack of diligence. See discussion *supra*. It is clear that simple lack of diligence amounts to negligence which, while weighing against the Government, does not weigh *heavily* against the Government.

delay," or, "Given to or characterized by tardiness." *Dilatory*, BLACK'S LAW DICTIONARY (10th ed. 2014). This definition proffered by Uranga connotes essentially two meanings; intended delay and unintended delay.

The Court finds that the term "dilatory," as used in <u>Bibb</u>, connotes intended delay as opposed to unintended delay. Looking at the quotation used by Uranga, the Eleventh Circuit said, "tangential, frivolous, dilatory, or [actions] taken in bad faith" weigh heavily against the Government. <u>Bibb</u>, 194 F. App'x at 622. The words surrounding "dilatory" all connote an action other than unintended delay. For instance, tangential or frivolous actions taken by the Government are likely intended to cause delay as they imply an action or series of actions done unnecessarily. Additionally, actions taken in bad faith are certainly intended to cause outright delay.

Looking at other cases that do not specifically use the term "dilatory," it is still clear that, to weigh heavily against the Government, a post-indictment delay taken on its own must be purposeful.[9] For instance, in <u>Barker</u>, the Supreme Court specifically found that *deliberate* attempts to delay weigh heavily against the Government. <u>Barker</u>, 407 U.S. at 532. Negligent, non-purposeful delays, on the other hand, do *not* weigh heavily against the Government. <u>Id.</u>

---

[9] The Court differentiates between cases where only a post-indictment delay occurred and cases were both pre and post-indictment delays occurred. As discussed *supra*, in combination cases, a pre-indictment delay can help a post-indictment delay weigh heavily against the Government even without evidence of *purposeful* post-indictment delay. <u>See</u> <u>Ingram</u>, 446 F.3d at 1336.

These cases put the term "dilatory" in context and require that the delay be purposeful. Therefore, the Court finds "dilatory" is used to connote intentional or bad faith delay.[10] See Doggett v. U.S., 505 U.S. 647, 657 (1992) ("[N]egligence is obviously to be weighed more lightly than a *deliberate* intent to harm.") (emphasis added).

Because the Court has determined that dilatory actions must be purposeful, the Government's reasons for delay do not weigh heavily against it. Specifically, there is nothing tending to show that Donnelly purposefully delayed in effectuating the arrest warrants. Instead, as discussed in Vidal's objections, the Government showed that Donnelly took at least some steps to determine the FBI procedure. While those steps were unduly lacking and only half-completed, they tend to show that the delay was not made purposefully or in bad faith.[11]

Uranga then focuses on the pre-indictment delay, arguing that the Magistrate Judge erred in finding that it was not inordinate and therefore did not help the post-indictment delay weigh heavily against the Government. First, Uranga challenges the way in which the Magistrate Judge compared the complexity of this case to the complexity of the Ingram case in concluding

---

[10] Furthermore, if the Court were to use the other connotation of "dilatory" (i.e. merely tending to cause delay), the dilatory action would more closely resemble negligent behavior rather than purposeful delay.

[11] Uranga also argues that the Court should consider the United States Attorney's Office ("USAO") when determining whether the Government's actions were dilatory. However, Urgana does not explain why the USAO's actions matter when the parties agree it was Donnelly's responsibility to move the case along.

22

Defendants' pre-indictment delay was not inordinate. He argues that no Eleventh Circuit case has suggested that courts should compare complexity, and therefore it was error to do so.

While the Court agrees that no Eleventh Circuit case has specifically instructed courts to compare their cases' complexities with the Ingram complexities, the Magistrate Judge's approach and conclusions were still proper.[12] In concluding that the pre-indictment delay was inordinate, the Eleventh Circuit considered "the crime . . . , the state of the proof against [the defendant] on the date of the indictment, and the Government's knowledge of [the defendant's] whereabouts." Ingram, 446 F.3d at 1339. The Eleventh Circuit found that the relatively non-complex nature of the crime and evidence made the two-year delay inordinate. Id.

Based on the Eleventh Circuit's reasoning, the Court should look at this case's complexity and compare it with Ingram's complexity to determine whether they were similar such that the pre-indictment delay was inordinate. In fact, the Eleventh Circuit's language even encourages such comparison See id. ("[T]he two-year post indictment delay in [Ingram] weighs more heavily than a two-year delay *in another case* might . . .") (emphasis added). Uranga provides no reason why this tactic constituted error, nor can the Court find any reason why the Magistrate Judge should not have compared the cases.

_____

[12] Additionally, as the Court discussed *supra*, comparing the facts of Ingram with the case at issue is the trend among lower courts within this Circuit. See, e.g., Henao-Toro, 2010 WL 1459472 at *13; Valiente, 2009 WL 1313198 at *12.

23

Next, Uranga argues that, if the Magistrate Judge can compare complexities, she should not have compared Defendants' case as a whole. Instead, Uranga argues the Magistrate Judge should have focused on the individual Defendants. Specifically, Uranga argues that, while the other Defendants' cases may have been complex, his was straight forward and did not require two years to investigate.

Uranga points first, to the fact that he was actually arrested at the scene of the second burglary. He was then immediately charged in state court based on the evidence available that very night. He argues that on the night of his arrest the officers had surveillance footage of the burglars inside the warehouse and were able to see that it was Uranga on the video. Additionally, Uranga argues that, on the night of the burglary, officers found a shoe print that exactly matched the shoe Uranga was wearing when arrested. According to Uranga, the Government had all it needed to indict Uranga within a few days of his arrest; and to wait two-years to indict was inordinate delay.

Though it may be true that the Government may have had enough information to indict Uranga within a few days of the second burglary on burglary charges, Uranga ignores the fact that he was also indicted for one count of conspiracy under 18 U.S.C. § 371. Dkt. No. [1]. That statute dictates, "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any

24

purpose . . . each shall be fined . . . or imprisoned not more than five years, or both." 18 U.S.C. § 371.

The Supreme Court has held that prosecutors and law enforcement officers working to bring charges against a defendant "have a right to investigate [a case] fully." U.S. v. Cerrito, 612 F.2d 588, 593 (1st Cir. 1979) (citing U.S. v. Lovasco, 431 U.S. 789, 790-91 (1977)). Just because it was clear Uranga had participated in the burglary does not mean their investigation into his role in a larger conspiracy was complete on the day they initially arrested him. Additionally, the Supreme Court has held that prosecutors "are under no duty to file charges as soon as probable cause exists." Lovasco, 431 U.S. at 790. Instead, prosecutors are permitted to gather more evidence such that "they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt." Id.

In this instance, if Defendants were only charged with burglary or transportation of stolen goods across state lines, the Court might be more likely to find that Uranga's pre-indictment delay was inordinate given the FBI's knowledge of his role early in the case. However, because Uranga was also charged with conspiracy, he was implicated in a larger, more complex scheme that required the FBI to gather far more evidence in an attempt to establish guilt beyond a reasonable doubt. For that reason, the Court is not persuaded by Uranga's argument that the individual investigation into his conduct was relatively simple, and thus the delay in his indictment was inordinate. Instead,

the Court finds that Uranga's pre-indictment delay was not inordinate given the complexity of the conspiracy.

### ii.  Fourth factor: Actual Prejudice

As discussed above, Uranga was the only Defendant to argue he had suffered actual prejudice. He claimed that, after he was arrested for the second burglary and subsequently released, he learned that the FBI was investigating the crimes. As such, he claims he suffered anxiety and distress related to the investigation as he did not know if or when he would be indicted and then arrested. The Magistrate Judge, however, found that his alleged anxieties and distress were conclusory and no different from the type of anxiety and stress a person might suffer after he or she has been arrested, let out on bond, and awaiting prosecution.

In Barker, the Supreme Court emphasized that "prejudice should be assessed in light of three interests:" (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired. Woodley, 484 F. App'x at 319 (citing Barker, 407 U.S. at 532). "Of these, the most serious is the last, because the inability of a defendant [to] adequately prepare his case skews the fairness of the system" Id. Nonetheless, "[t]he defendant must proffer more than 'conclusory assertions of prejudice' or 'unsubstantiated allegations of witnesses' faded memories.'" Id. (quoting U.S. v. Hayes, 40 F.3d 362, 366 (11th Cir. 1994)).

Uranga states that his prejudice falls within the second category: minimizing anxiety and concern of the accused. He states that, when he found out about the federal case in 2014, he was not told whether he had been indicted, who the prosecutor was, or whether this arrest would be forthcoming. Accordingly, he states that he could not make plans in advance as he was not sure when he would be arrested. Additionally, he claims he had to worry every day that he sent his kids to school that he would be arrested before they came home.

While Uranga's worries may have been difficult, the Court agrees with the Magistrate Judge that he has failed to present more than conclusory assertions that he suffered anxiety.[13] See id. As such, Uranga's objection is overruled.

### c. Defendant Oliva's Objections

Oliva appears to make one objection to the Magistrate Judge's findings. Specifically, he states that the Magistrate Judge found that the reason for the delay (factor two) weighed heavily against the Government while the length of the delay (factor one) did not. However, Oliva's starting premise is incorrect. The Magistrate Judge found, and both parties agreed, that the length of the delay was presumptively prejudicial, triggering the other three Barker factors. The Magistrate Judge did *not* find that the reason for the delay weighed heavily against the Government, as Oliva suggests.

---

[13] The Court notes that, with the second factor, the burden was on the Government to present valid reasons for delay. However, for the fourth factor, Defendants have the burden of proving actual prejudice. See Woodley, 484 F. App'x at 319.

It appears that Oliva is actually concerned with the Magistrate Judge's handling of the <u>Ingram</u>, pre-indictment delay analysis. As such, the Court will focus on those arguments.

First, Oliva argues that the Magistrate Judge should not have concluded that the pre-indictment investigation took the full two years because there is insufficient evidence to support this conclusion. Oddly, however, in making this argument, Oliva recites all the supporting evidence and outlines the investigative steps executed by Donnelly. Nonetheless, he argues that many of the steps were unnecessary and therefore, the pre-indictment delay was inordinate.

For instance, Oliva focuses on the 25 witnesses interviewed by Donnelly. He claims that, of the 25, 16 were law enforcement officers, two were managers of the burglarized stores, one was an employee of a burglarized store, one was the owner of a burglarized store, and another was an investigator for Georgia Power, the parent company of one of the burglarized stores.

Next, Oliva focuses on the 92 exhibits presented by the government. He states that, of the 92, 20 were comprised of photographs and the vast majority of the evidence appears to have been gathered in the investigation of the robbery scene before Donnelly became involved.

While Oliva focuses on these pieces of evidence and lists them in his brief, he does not actually present an argument as to why they are insufficient to show the complexity of the case. Nevertheless, even if Oliva had made such an argument, <u>Ingram</u> does not require the Court to micromanage law enforcement

investigations to determine whether each witness and each exhibit was necessary to procure.[14] As the Government argues, the <u>Ingram</u> court did not evaluate each piece of evidence. Instead, it took a "high level view of the facts" to determine whether the delay was inordinate. Dkt. No. [102] at 10.

Next, Oliva contends that the evidence shows that the majority of the investigation into the two burglaries was completed before March 27, 2012, the date Donnelly took over the investigation. However, Oliva simply states that the investigation was mostly complete without explaining why the evidence shows most of the investigation was completed prior to Donnelly's assignment. Nonetheless, as the Court has already discussed, the report written by Donnelly demonstrates that important evidence was procured and investigative steps were being taken after Donnelly joined the case and even within a few months of indictment.[15] <u>See</u> Dkt. No. [103-2]. As such, Oliva's argument that the investigation should not have taken two years is unpersuasive.

---

[14] At one point, Oliva contends that the evidence obtained by Donnelly in June and August of 2013 is not relevant in determining the length of the investigation. However, Oliva gives no actually argument as to *why* that evidence does not inform the length of the investigation. He merely asserts the evidence is not relevant.

[15] Defendants have asked for an evidentiary hearing regarding whether the investigation should have lasted two years and whether the information gathered during the two years was necessary for the Indictment. However, the Magistrate Judge already held an evidentiary hearing on these issues presented in Defendants' Motions. Additionally, as the Court has already discussed, <u>Ingram</u> does not ask the Court to micromanage law enforcement investigations. The information produced by the Government sufficiently demonstrates that the investigation was reasonably long given the complex nature of this alleged conspiracy.

Lastly, Oliva appears to take issue with the Magistrate Judge's finding that the reason for the delay did not weigh heavily against the Government.[16] Oliva appears to agree that the Government's actions evidenced gross negligence. See Dkt. No. [101] at 7 ("Indeed, it is the lack of diligence and credibility presented by the Government that evidences gross negligence."). However, as the Court has already discussed, gross negligence alone does not weigh heavily against the Government. Additionally, to the extent Oliva attempts to argue that the Government exercised a lack of diligence, as discussed above, lack of diligence also does not weigh heavily against the Government. As such, Oliva's objections are overruled.

## IV.  CONCLUSION

In sum, although the Court finds the Government's delay extremely troubling, an analysis of the Supreme Court and Eleventh Circuit precedents supports the Magistrate Judge's conclusion. In accordance with the foregoing, the Court **ADOPTS** the Magistrate Judge's R&R [95]. Defendants' Motions to Dismiss the Indictment is **DENIED** [37, 45, 61]. The Clerk is **DIRECTED** to refer this case back to Magistrate Judge Walker to assess pre-trial motions.

---

[16] As discussed *supra*, Oliva actually categorizes this objection as an objection to the Magistrate Judge's finding that the *length* of the delay did not weigh heavily against Defendants. However, in discussing this issue, Oliva focuses on the law informing *reason* for delay. As such, the Court construes Oliva's objection as to the Magistrate Judge's finding that the reason for delay does not weight heavily against the Government.

**IT IS SO ORDERED** this 3rd day of November, 2016

LEIGH MARTIN MAY
UNITED STATES DISTRICT JUDGE